**BELDEN MFG. CO. v. GLADE et al.**

**No. 6092.**

Circuit Court of Appeals, Seventh Circuit.

June 3, 1937.

Cyril A. Soans and Paul J. Glaister, both of Chicago, Ill., for appellant.

George Bayard Jones, of Chicago, Ill., for appellees.

Before SPARKS and MAJOR, Circuit Judges, and LINDLEY, District Judge.

SPARKS, Circuit Judge.

This appeal is from a decree of the District Court holding United States patent No. 1,858,196 to Wermine, assigned by him to appellant, not infringed. This patent was issued May 10, 1932, on an application filed March 28, 1927. The accused device was covered by appellees' United States patent to Glade, No. 1,988,725, issued January 22, 1935, on an application filed August 5, 1929. The answer was non-infringement and invalidity, and the court did not pass on the question of validity.

The Wermine patent relates to electric plug connectors of the type used for connecting an electric device to an electric supply current, a suitable socket connected to the line being provided for receiving the plug. The stated objects of the invention were to provide a practically unbreakable, weatherproof plug connector, easy to manufacture, of reasonably low cost, and capable of being easily and quickly connected.

Appellant relied upon claims 11, 12, 13, 26 and 27. The first three claims are specific as to certain features of the plug, of which claim 12 is typical,[1] and the last two claims are directed more broadly to the basic four-element combination, of which claim 27[2] is typical.

[1] "12. In an electric plug connector, the combination of a contact prong, a conductor connected to said contact prong and a two part housing for said connection, comprising an inner part and an outer part, the latter having an opening for admitting said inner part, one part having a recess therein for receiving a portion of the prong and into which recess said prong portion is capable of being introduced after the connection is effected, said recess constituting a means for initially positioning said prong in said recessed part before said parts are assembled together, the other part constituting a closure for the said recess, the inner part having a trans- verse dimension normally superior to the interior dimension of the opening in said outer part, one of said parts being made of elastic material so as to permit assembly of said parts together and so as to maintain said parts in position after assembly, and thereby complete the positioning of said prong securely in said recess, the prong member being interposed between said parts and the prong member and one of said parts being provided respectively with parts having an interlocking engagement therebetween so as to prevent movement of the prong longitudinally relative to said housing."

[2] "27. An electric connector comprising inner and outer body parts, one of

The patented plug connector comprises a body portion of resilient material preferably rubber, which is provided with an axial aperture extending therethrough. The body portion is preferably round in cross section and is shaped so as to facilitate gripping thereof when inserting or withdrawing from the socket.

The axial aperture is preferably round in cross section to accommodate an end portion of the cable, which comprises a pair of relatively insulated conductor members enclosed in a sheath of insulating material such as rubber.

The body portion is recessed at opposite sides of the axial aperture to receive inner end portions of contact prongs. These prongs are made of stiff metal, and each is provided with a lug punched outwardly therefrom and adapted to receive a bared portion of the respective conductors between the lug and the strip proper. The bared portion of the conductor may be soldered to the strip and the lug bent inwardly, so as to clamp the conductor in place and to some extent relieve the soldered connection of strain. Such connection of the conductors to the prongs results in an abutment means, extending laterally from the prongs, which is adapted to engage a portion of the plug so that the prongs cannot readily be pulled endwise from the plug.

In order to maintain the prongs in properly spaced relation, a plug is provided which is adapted to be seated in the aperture at the end of the body from which the prongs project. It is provided with recesses for receiving the prongs, and also with recesses in its inner portion for receiving the extreme inner end portions of the conductors. The plug is also provided with an intermediate portion of reduced diameter, and the aperture in the body is provided with an end portion of enlarged diameter, which is provided with an intermediate portion of reduced diameter to correspond to the diameter of the reduced portion of the plug. The body being of resilient material such as rubber, and the plug which may be of rubber also, may be forced into the axial aperture, so that the reduced portion of the aperture engages the

reduced portion of the plug, thereby locking it in place.

Optional means for preventing sharp bending of the cable next to the plug is provided by a sleeve of rubber, or other material of which the plug is made, integral with the plug and extending a distance sufficient to reinforce and protect the cable.

A modified construction provides a body portion similar to the one above referred to, together with a cap member, either or both of which may be of resilient material such as rubber and provided with a dovetail interlocking connection whereby the two members are adapted to be locked together. In this form the body portion is provided with an axial aperture for receiving the cable, and the cap member is apertured for permitting passage therethrough of a pair of prongs which are seated in the body portion by means of recesses. The conductors of the cable may be connected to the respective prongs, as hereinbefore described, and the cap member may conveniently be provided with a separating boss for spreading the extreme inner end portions of the conductors. An upstanding head or edge portion of resilient material may be provided on the outer body portion, which is adapted to engage the face of the socket, which is effective to produce a substantially waterproof joint.

The accused device of the Glade patent relates to the same subject as that of the Wermine patent. Its objects were to produce a terminal cap consisting of few parts, simple design, and sturdy construction; one that permits the conductor ends to be connected therewith in a secure and reliable manner, and whose prongs or blades will be substantially and reliably connected with the cap members. A further object was to produce a plug and cord connection, having such a secure fastening therebetween, and between the wires and the blades, that the cable may be grasped either adjacent the cap or a greater distance therefrom, for removing the plug from the socket, without damage to the. cap, cable, wires or blades.

Appellees' device or cap comprises a core, a collet, a cable, and two blades or prongs. The blades are parallel and ex-

which is made of resilient material, said parts being manufactured independently of each other and capable of being subsequently assembled in interfitting relation only because of the resiliency of

said resilient material part, and spaced connector prongs having inner end portions interposed between said body parts, said inner body part being interposed between said prongs."

tend from the cap to connect with the socket. The cable consists of two wires which transmit the current, and the ends of the wires are bared for contact with the blades. In these respects the blades and cable are identical with all prior. art in this field. It was common practice to mount the blades to a cap member by merely bending them in such manner as to allow a rivet or screw to be passed through the bent portion, thus securing it to the cap body. This constituted a faulty and fragile connection, and no doubt caused the disclosures of both Wermine and Glade to come into existence.

Wermine corrected that defect in the manner hereinbefore set forth. Glade corrected it by forming the blades so as to interlock with grooves and indentations formed on the outer surface of the core, which are held in position by a collet whose interior surface is serrated and which is forced on the core and held in place thereon by friction. Each blade is bent and the portion between these bends forms right angles with both the upward protruding portion and the downward portion, which latter portion continues downward in a plane parallel to the protruding portion. A further right angle bend at the base of the downward continuing portion provides means for locking the blade against displacement, thus forming a hook at the base of the blade. A notch is formed in the end of this hook to accommodate one of the conductor wires.

The core has peripheral grooves for accommodating the portions of the blades, and end grooves to accommodate the bends in the blades, and also sockets at the lower ends of peripheral grooves for the purpose of receiving the hook portions of the blades. The cable wires after being introduced through the bore of the core are led away from each other from the center of the core, and each is laid along its respective end groove and then bent to follow the peripheral paraxial groove. The hook of each blade is then inserted in its respective socket above referred to, and the notch in the hook is occupied by the wire, and holds it against lateral displacement. The members of each blade fit snugly into their respective grooves, with their respective conductor wires underneath, while the collet is pressed on in position. When so assembled the collet frictionally holds the wires securely in position, and retains the blades against all movement.

The core and collet are made of any suitable insulating material, such as semi-hard rubber, Bakelite, fiber, or similar material, the core preferably being made of hard fiber.

It is obvious that the District Court thought, and we think rightly, that both Wermine and Glade in their disclosures were working in a very narrow field. It was of the opinion that if Wermine's claims in suit should be construed sufficiently broadly to read upon Glade's device, they would also read upon the following earlier patents: United States patent No. 1,476,-028 to Berge, French patent No. 529,132 to Stalhane, German patent No. 357,516 to Gollmer, and Austrian patent No. 96,-333 to Tamussino.

The application resulting in the Wermine patent No. 1,858,196, now in suit, was prosecuted until the end of October, 1930. On November 1, 1930, the Patent Office set up interference between Wermine on the one side and Kollath and Berolzheimer on the other. Upon the preliminary statement Berolzheimer was dropped because he did not allege a date of conception earlier than the filing dates of Wermine. Prior thereto Wermine had filed a second application relating to an improved form of his connector plug, which was also involved in a separate interference with Kollath.

The interferences between Wermine and Kollath were settled by agreement, wherein Wermine filed a concession of priority to Kollath, as to count 1[3] of the interference involving Wermine's first application, and Kollath conceded priority to Wermine as to the other counts.

---

[3] "In combination, a flexible electric conducting cord, a contact prong connected to the end of said cord and projecting a substantial distance beyond the end of said cord, and a two-part body portion constituting an enclosure for said connection, one of said parts being apertured to receive and fit the cord and the other of said parts serving to position the projecting end of said prong, said parts being interlocked against separation one from the other when they are assembled together, and one of said parts being formed of resilient material capable of being distorted to permit such assembly."

The particular claims in suit were inserted in Wermine's second application in January, 1930, and not earlier than that date were transferred to Wermine's first application. This was after appellees' plug had been put on the market in November or December of 1929, and after Glade's application for a patent had been pending for about six months.

Following the agreed settlement of interferences, patents were issued on both applications of Wermine on May 10, 1932, Aside from those interferences the examiner over a long period of time persistently urged many objections to Wermine's claims, citing many patents including the French, German, and Austrian patents above referred · to. No reference, however, was made to the Berge patent.

■ It must be borne in mind that the Glade application had been pending since August 5, 1929, and a patent was issued on it on January 22, 1935. We also must not lose sight of the fact that this application and Wermine's applications were all pending in the same division and handled by the same examiner. The presumption of validity which attaches to Wermine's patent likewise attaches to Glade's patent. It is obvious, therefore, that the examiner was of the opinion that each disclosed novelty. A consideration of the prior Berge patent will at once disclose the narrow limits in which both Wermine and Glade were laboring.

The Berge patent relates to electric connectors particularly designed for use in connection with spark plugs. Illustrative of the disclosure we assume a spark plug having an insulator and an electrode projecting from its outer end to form a terminal post. This post is provided with ·an axially peripheral groove, and with a tapered rounded outer end. There is an insulated conductor for the terminal connector, at the end of which is a coupling for engaging the terminal post.

In order that the conductor may be arranged in axial alignment with the spark plug, the coupling is in the form of a resilient socket member, which may be sleeved over the post and will be yieldably held from disengagement therefrom. · The coupling comprises segmental members, preferably stampings, adapted to embrace the insulation on the conductor on opposite sides thereof. They are formed with a shoulder and a portion extending forward-

ly therefrom, of slightly smaller diameter and substantially corresponding internally to the external diameter of the terminal post. A ferrule member is provided for fitting over the ·shank ends of the segmental members, which embrace the terminal post, to clamp them against the insulation of the conductor. There is an inturned flange on the ferrule for engaging the shoulder on the segmental members.

To mount the coupling upon the conductor, the stranded metallic conductor is bared of the insulation and is divided and turned backward over the outer surface of the insulation, preferably upon diametrically opposite sides thereof. The segment members of the coupling are placed against the return bent ends of the bared portions of the conductor, after which the ferrule is engaged with the outer ends of the coupling shanks and pressed thereon so as to force them inward against the insulation with considerable pressure. This will cause the imbedding of the conductor in the insulation and will compress the latter so that the ferrule is substantially flush with the surface of the insulation beyond the same. Prongs are provided at the inner ends of the coupling shanks, which are pressed into the insulation, and form a locking engagement therewith. When thus assembled the coupling will be firmly attached to the insulated conductor and will be in electrical connection with its bared metal portions. The shanks of the coupling are further provided with inwardly pressed portions which are so located that when the coupling is sleeved upon the post the inwardly pressed portions of the sleeve will engage the groove in the post. To prevent accidental disengagement of the ferrule it may be formed with a pair of inwardly deflected tongues which, when the parts are assembled, will shape into apertures respectively formed in the shank portions of the coupling.

Thus the connector may be quickly attached to or detached from the plug by telescopically engaging the coupling with the terminal post. The inwardly extending portions in passing over the outer end of the post will expand the socket, but this is permitted by the yieldable character of the insulation to which the shanks are clamped.

■ It is obvious that if the claims in suit are construed broadly, they not only read upon Glade but also upon Berge, for, indeed, Glade more nearly follows Berge

than he does Wermine. It, therefore, becomes our duty to limit the claims, if reasonably possible, so as not to infringe Berge. This we think can not be done without limiting the claims to the detailed arrangement and assembly of parts. We are convinced that Wermine's novelty, if any, consisted in first soldering the wires to the blades, thereafter pushing the blades into their seats in a cylindrical or cup-shaped body of yielding material, such as rubber, and then forcing a small dove-tailed rubber plug into the central opening. We feel impelled to this conclusion in order, if possible, not to strike down the integrity of the patent.

In appellees' device the relative arrangements of the main body member and the auxiliary mmbers are quite different. No solder is required. The main body, the ferrule, and the metal blades are held together by a driving fit, supplemented by an interlock of the hooked ends of the blades with recesses in the outside of the body member. Any range of equivalents in appellant's favor which would sustain the charge of infringement, we fear would destroy the novelty, if any, of the disclosure.

Appellant attempts to distinguish Berge from Wermine in that Berge does not have an inner body part which serves the dual purpose of inclosing the electrical connections of the connector and of providing a safe handle for the connector. It is obvious, however, that the insulation in Berge does serve as the inner body part of a two-part device, which has control blades clamped between the parts. The specific handle claimed by Wermine, and its objects, it is true, is not present in Berge. Neither is it present in Glade.

Appellant further contends that Berge does not suggest that his device could be used otherwise than as a spark plug connector. While it is true that his specifications refer only to a spark plug connector, yet his claims make no reference to the words spark plug. They merely refer to electrical connectors. In any event it seems clear that Berge's specifications with respect to his preferred use would clearly teach an ordinary electrical mechanic that it might be used, generally as he claimed, in all electrical connections of a similar character.

It is further urged by appellant that in Berge the two contracts which project from the plug are not, in practice, inserted in a receptacle in a baseboard, but are applied to a spark plug. We are unable to conceive, however, why that fact should detract from the effectiveness of Berge as a reference.

We feel that it is not necessary to refer in detail to the French, German and Austrian patents, upon which the District Court also relied, other than to say that they, with Berge, clearly anticipate Wermine with respect to all points upon which appellant claims infringement.

We therefore hold that there was no infringement, and that it is not necessary to pass upon the other questions raised.

Decree affirmed.